J-S34027-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RUSSELL JAMES COSTELLO | |
| Appellant | No. 1740 WDA 2017 |

Appeal from the Judgment of Sentence entered November 7, 2017
In the Court of Common Pleas of Fayette County
Criminal Division at No: CP-26-CR-0000957-2017

BEFORE: BOWES, STABILE, and STRASSBURGER,[*] J.

MEMORANDUM BY STABILE, J.:                    **FILED AUGUST 29, 2018**

Appellant, Russell James Costello, appeals from the November 7, 2017 judgment of sentence imposing an aggregate two to four years of incarceration for theft by unlawful taking, receiving stolen property, unlawful possession of a firearm, terroristic threats, possession of an instrument of crime ("PIC"), simple assault, recklessly endangering another person ("REAP"), and disorderly conduct.[1]  We affirm.

The trial court summarized the pertinent facts:

> Judith Sarah Moran dated Appellant […] for a period of sixteen years, was engaged to him, and lived with him until the Fall of 2016 when the relationship ended.  Around six o'clock in the evening of April 10, 2017, Moran drove to the VFW in

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3921, 3925, 6105, 6106, 2706, 907, 2701, 2705, and 5503, respectively.

Fairchance, Pennsylvania. Moran's vehicle, a silver Sebring, was parked in the lot of the VFW when someone alerted her that the windshield had been smashed. Moran contacted the state police and waited to view the video of the incident. Upon reviewing the video, Moran was able to identify Appellant as the person who smashed her windshield.

Prior to her leaving for the evening, Barry Blosser arranged to give Moran a ride. Blosser went out to the parking lot to warm his car and to make sure it was safe for Moran to exit the VFW. Blosser indicated that it was safe and Moran met Blosser at the door to the VFW. As the two exited, Moran saw 'something fast coming from [her] left eye and [Appellant] had come from the flagpole and bushes and was running at them.'

Moran testified that Appellant first came at Blosser and then came at her and held her by the hair. Moran ran back to the side door of the bar at the VFW to pound on it asking for 911 to be called. Moran could see something long, like a stick, in Appellant's hand but was unable to identify it because it was dark outside. Appellant threw Moran to the ground from holding her in a headlock or choke hold. Blosser asked Appellant what he was doing to which Appellant responded by knocking Blosser and Moran to the ground. Blosser was 'knocked out cold.' At that point, Moran saw a gun on the ground and watched as Appellant picked it up and pointed it at them. Appellant continued to point the gun at Blosser and Moran while talking, then when others exited the VFW, Appellant waived the gun at everyone, gesturing, and saying 'I'll kill all of you.' Appellant left the parking lot and was not seen again.

Barry Blosser testified that he was at the VFW when Moran's windshield was busted and he arranged to take her home since she was afraid. When the two were ready to leave, Blosser went to the parking lot to look around and start the car, and while he was in the car, retrieved his Glock pistol from the car and put it in his front pocket. Blosser signaled back inside that it was okay for Moran to come to the car, but when she exited the VFW, Appellant appeared and ran past Blosser carrying something that looked like a crow bar. Blosser pulled his gun and told Appellant to drop it, and Appellant complied by dropping the object. Appellant then proceeded toward Moran, grabbing her and 'shaking the shit out of her.' As Moran broke loose from Appellant's grasp, she ran back to the VFW, and Blosser and Appellant began arguing, but

Appellant chased after Moran and grabbed her again. Blosser tried to separate Appellant from Moran when Appellant hit him and he fell to the ground. Blosser watched as Moran and Appellant fought for his pistol on the blacktop. Appellant grabbed the gun, pointed it at Blosser and pulled the trigger. The gun was loaded but, according to Blosser, there was not a bullet in the chamber, so it did not discharge.

Trial Court Opinion, 1/23/18, at 2-3 (record citations omitted).

The Commonwealth filed its information on June 16, 2017. On October 4, 2017, a jury found Appellant guilty of the aforementioned offenses. The trial court imposed sentence on November 7, 2017, and this timely appeal followed. On December 5, 2017, the trial court ordered Appellant to file a concise statement of the matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied on December 18, 2017, identifiying the following issue:

> **Issue No. 1:** Whether the evidence was legally and factually insufficient to prove that [Appellant] was guilty of theft by unlawful taking, receiving stolen property, possession of a firearm prohibited, firearms not to be carried without a license, terroristic threats and possession of a weapon?

Appellant's Concise Statement, 12/18/17, at 1. Thus, Appellant challenged the sufficiency of the evidence for six convictions, but he failed to specify which element or elements the Commonwealth failed to prove. This Court has written:

> [W]hen challenging the sufficiency of the evidence on appeal, the Appellant's 1925 statement must specify the element or elements upon which the evidence was insufficient in order to preserve the issue for appeal. Such specificity is of particular importance in cases where, as here, the Appellant was convicted

of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt.

**Commonwealth v. Gibbs**, 981 A.2d 274, 281 (Pa. Super. 2009), **appeal denied**, 3 A.3d 670 (Pa. 2010) (internal citations and quotation marks omitted); **see also Commonwealth v. Garland**, 63 A.3d 339, 344 (Pa. Super. 2013). Based on the foregoing, we deem Appellants sufficiency of the evidence challenges waived.

Moreover, even were we to address the merits, Appellant would not obtain relief.

The standard we apply in reviewing sufficiency of the evidence is whether in viewing all the evidence admitted at trial in light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. Any doubts concerning an appellant's guilt are to be resolved by the trier of fact unless the evidence was so weak and inconclusive that no probability of fact could be drawn therefrom. The trier of fact while passing upon credibility of witnesses ... is free to believe all, part or none of the evidence. Additionally, [t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

**Garland**, 63 A.3d at 344–45 (internal citations and quotation marks omitted).

Concerning theft by unlawful taking,[2] receiving stolen property,[3] and the two firearms offenses[4]—all of which turn on Appellant's possession of Blosser's firearm—Appellant argues that he picked the gun up to avoid being shot. Appellant's Brief at 17-18.  Appellant's argument is based on his own self-serving testimony which, as the trial court pointed out, the jury disbelieved. The trial court opinion adequately addresses Appellant's challenges to the theft and weapons charges.  Were we to reach the merits of these issues, we would reject them for the reasons stated in the trial court's opinion of January 23, 2018.

---

[2]  "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S.A. § 3921(a).

[3]  "A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner."  18 Pa.C.S.A. § 3925(a).

[4]  Section 6105 provides:  "A person who has been convicted of an [enumerated] offense […] shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth."  18 Pa.C.S.A.§ 6105(a)(1).

Section 6106 provides:  "Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree."  18 Pa. C.S.A. § 6106(a)(1).

The entirety of Appellant's argument as to terroristic threats[5] is that "it was not [Appellant's] intent to terrorize. His intention was to get out of the situation without being shot." Appellant's Brief at 18. Once again, this rests on his own self-serving testimony and ignores evidence that he waived the gun at Moran, Blosser, and other passers by stating, "I'll kill all of you." We would reject Appellant's challenge to the terroristic threats convictions for the reasons explained in the trial court's opinion.

Finally, Appellant argues the evidence was insufficient to convict him of PIC[6] because he was never seen in possession of the hammer police found on the ground at the scene. Appellant's argument ignores that Moran and Blosser saw him in possession of an object that appeared to be a crow bar. Also, Appellant appeared on surveillance video smashing the windshield of Moran's car. Sufficient circumstantial evidence establishes that Appellant was in possession of the hammer found at the scene of the crime, and that he used it with the intent to commit a crime. We would reject Appellant's challenge to his PIC conviction based on the trial court's opinion. We direct that a copy of the trial court's January 23, 2018 opinion be attached to this memorandum.

---

[5] "A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another[.]" 18 Pa. C.S.A. § 2706(a)(1).

[6] "A person commits a misdemeanor of the first degree if he possesses a firearm or other weapon concealed upon his person with intent to employ it criminally." 18 Pa.C.A. § 907(b).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/29/2018



IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY,
PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF
PENNSYLVANIA,                        :

                                     :

vs.                                  :

                                     :

RUSSELL JAMES COSTELLO,              :

                                     :

          Appellant.                 :          No. 957 of 2017

## OPINION IN SUPPORT OF JURY VERDICT

VERNON, J.                                            January 23, 2018

Following a trial by jury, Appellant, Russell James Costello, was found guilty of the following nine charges: (1) Count 1– theft by unlawful taking movable property[1], (2) Count 2 – receiving stolen property[2], (3) Count 3 – possession of firearm prohibited[3], (4) Count 5 – firearms not to be carried without license[4], (5) Count 8 – terroristic threats with intent to terrorize another[5], (6) Count 9 – possession of weapon[6], (7) Count 10 – simple assault[7], (8) Count 11 – recklessly endangering another person[8], and (9) Count 12 – disorderly conduct engage in fighting[9] and was also convicted of summary offenses by this Court.

Appellant was sentenced to a term of incarceration of three and one-half (3 1/2) to nine (9) years. Appellant has appealed to the Superior Court and this Opinion is in support of the jury verdict and sentence imposed. On appeal, the Appellant raises the following issues:

(1) Whether the evidence was legally and factually insufficient to prove that Appellant was guilty of theft by unlawful taking, receiving stolen property,

---

[1] 18 Pa.C.S.A. §3921(A)
[2] 18 Pa.C.S.A. §3925(A)
[3] 18 Pa.C.S.A. §6105(A)(1)
[4] 18 Pa.C.S.A. §6106(A)(1)
[5] 18 Pa.C.S.A. §2706(A)(1)
[6] 18 Pa.C.S.A. §907(B)
[7] 18 Pa.C.S.A. §2701(A)(3)
[8] 18 Pa.C.S.A. §2705
[9] 18 Pa.C.S.A. §5503(A)(1)

possession of a firearm prohibited, firearms not to be carried without a license, terroristic threats and possession of a weapon.

## STATEMENT OF THE CASE

Judith Sarah Moran dated Appellant, Russell James Costello, for a period of sixteen years, was engaged to him, and lived with him until the Fall of 2016 when the relationship ended. N.T., 10/2-4/2017, at 9-10, 25. Around six o'clock on the evening of April 10, 2017, Moran drove to the VFW in Fairchance, Pennsylvania. *Id.* at 11-12, 26. Moran's vehicle, a silver Sebring, was parked in the lot of the VFW when someone alerted her that the windshield had been smashed. *Id.* at 11-12. Moran contacted the state police and waited to view the video of the incident. *Id.* at 13. Upon viewing the video, Moran was able to identify Appellant as the person who smashed her windshield. *Id.* at 14.

Prior to her leaving for the evening, Barry Blosser arranged to give Moran a ride. Blosser went out to the parking lot to warm his car and to make sure it was safe for Moran to exit the VFW. *Id.* at 15. Blosser indicated that it was safe and Moran met Blosser at the door to the VFW. *Id.* As the two exited, Moran "saw something fast coming from [her] left eye and [Appellant] had come from the flagpole and bushes and was running at [them]." *Id.*

Moran testified that Appellant first came at Blosser and then came at her and held her by the hair. *Id.* at 16. Moran ran back to the side door of the bar at the VFW to pound on it asking for 911 to be called. *Id.* Moran could see something long, like a stick, in Appellant's hand but was unable to identify it because it was dark outside. *Id.* at 16, 18. Appellant threw Moran to the ground from holding her in a headlock or choke hold. *Id.* at 16. Blosser asked Appellant what he was doing to which Appellant responded by knocking Blosser and Moran to the ground. *Id.* at 17. Blosser was "knocked out cold." *Id.* at 32. At that point, Moran saw a gun on the ground and watched as Appellant picked it up and pointed it at them. *Id.* at 17. Appellant

- 2 -

continued to point the gun at Blosser and Moran while talking, then when others exited the VFW, Appellant waved the gun at everyone, gesturing, and saying "I'll kill all of you." *Id.* at 17-18. Appellant left the parking lot and was not seen again. *Id.* at 18.

Barry Blosser testified that he was at the VFW when Moran's windshield was busted and he arranged to take her home since she was afraid. *Id.* at 35-37. When the two were ready to leave, Blosser went to the parking lot to look around and start the car, and while he was in the car, retrieved his Glock pistol from the car and put it in his front pocket. *Id.* at 38. Blosser signaled back inside that it was okay for Moran to come to the car, but when she exited the VFW, Appellant appeared and ran past Blosser carrying something that looked like a crow bar. *Id.* at 39-40. Blosser pulled his gun and told Appellant to drop it, and Appellant complied by dropping the object. *Id.* at 40. Appellant then proceeded toward Moran, grabbing her and "shaking the shit out of her." *Id.* As Moran broke loose from Appellant's grasp, she ran back to the VFW, and Blosser and Appellant began arguing, but Appellant chased after Moran and grabbed her again. *Id.* at 41. Blosser tried to separate Appellant from Moran when Appellant hit him and he fell to the ground. *Id.* at 42-43. Blosser watched as Moran and Appellant fought for his pistol on the blacktop. *Id.* at 43. Appellant grabbed the gun, pointed it at Blosser and pulled the trigger. *Id.* at 43. The gun was loaded but, according to Blosser, there was not a bullet in the chamber, so it did not discharge. *Id.* at 44.

Blosser testified that Moran placed herself in front of him, but Appellant threatened that he would shoot her. Earl Leadbeater, the bartender, and Karen Ware, a patron, came into the parking lot and Appellant threatened to kill them too. *Id.* at 44-45. Blosser watched as Appellant "worked the slide and put a bullet in the chamber" of the gun before he got in his truck and left.

- 3 -

*Id.* at 45. Blosser never gave the gun to Appellant nor did he give permission to use the gun to Appellant. *Id.* at 46. Blosser never recovered the firearm from him. *Id.*

Earl Leadbeater was the bartender at the VFW on April 10, 2017. *Id.* at 54. Blosser telephoned Leadbeater about three minutes after he left to send Moran out to the car. *Id.* at 55. Leadbeater unlocked the door, let Moran exit, and relocked the door to the VFW. *Id.* at 55. About a minute later, Moran began beating on the locked door which caused Leadbeater to grab the phone, call 911, and give the phone to Karen Ware. *Id.* at 56-58. Leadbeater "didn't want no instances happening in the bar" and when he observed Blosser laying against a guardrail and Appellant coming toward Moran, he shut the locked door to the VFW. *Id.* at 57.

Karen Ware was a customer in the VFW that night and observed Moran and Blosser on the ground outside while Appellant waved a gun around "erratically hollering." *Id.* at 65-66. Leadbeater exited the VFW through a different door and when Appellant saw him, pointed the gun at him. *Id.* at 58. Leadbeater heard Appellant say "It's not my gun. It's his gun." *Id.* at 59. Appellant then left in his truck, and everyone went back inside the VFW. *Id.* at 59. The state police responded to the scene and requested to view the videotape of the parking lot. *Id.* at 60.

Harry Eutsey is the Post Quartermaster for the VFW in Fairchance and controls the video surveillance. *Id.* at 68-69. Eutsey testified that the VFW maintains a camera with video surveillance of the parking lots and he was summoned that night for the police to view the footage. *Id.* at 69. Eutsey played the recording of the parking lot showing the troopers the incident and created a copy of the recording for them. *Id.* at 72; Commonwealth's Exhibit 2.

Trooper Steven Moyemont of the Pennsylvania State Police responded to the 911 call from the VFW. *Id.* at 76-77. Another patrol unit responded to the area and stopped Appellant in his vehicle and identified a Glock firearm on the front seat. *Id.* at 77-79. The weapon was loaded

with one round in the chamber and had a magazine containing eight other rounds. *Id.* at 79; Commonwealth's Exhibit 3. The firearm was later tested and found functional. *Id.* at 81; Commonwealth's Exhibit 4.

Appellant was arrested and transported to the barracks while Trooper Moyemont returned to the VFW to interview witnesses. *Id.* at 84-85. While examining the scene, a hammer was found by the police in the parking lot near the area that Moran and Blosser first noted a long object was dropped from Appellant's hand. *Id.* at 94.

While in custody, and following his *Miranda* warnings, Appellant gave a statement to Trooper Moyemont that explained he and Moran had been in a romantic relationship that ended and that he had tried calling her that day and she would hang up which "really pissed [him] off." *Id.* at 97-99. Appellant admitted to smashing Moran's windshield earlier in the evening. *Id.* at 99. Appellant then laid in the grass waiting for Moran to leave the VFW. *Id.* at 100. Appellant watched Moran come outside and walked towards her and Blosser. *Id.* According to Appellant, Blosser pulled the gun to which Appellant told Trooper Moyemont, "I punched him in the face with my right hand and I took the gun out of his hand at the same time with my left hand, and then we went to the ground." *Id.* Appellant claimed to take the gun from Blosser to defend himself. *Id.* Appellant said he took the gun with him because he was not going to just give it back. *Id.* at 100-101. Appellant had a fresh scrape on his right knee consistent with a fall in the video surveillance. *Id.* at 103.

The Commonwealth and Appellant entered stipulations that he is in a class of persons not permitted to possess a firearm and that he did not have a valid license to carry a firearm. *Id.* at 101-103. At the time he was scheduled for a preliminary hearing, on April 18, 2017, Appellant stated to Trooper Moyemont that he hoped he and Trooper Ashton "both get shot in the head"

- 5 -

and that he "should have went out in a shootout that night" and "this will be over if I get out." *Id.* at 104-105.

Appellant testified at trial, admitting that he and Moran had ended a long-term romantic relationship, and that on the evening of April 10, 2017, he saw her car parked at the VFW and he smashed her window because he was "pissed off." *Id.* at 116-120. Appellant stated that Moran continued to text message him after the investigation into her car window being smashed and that he returned to the VFW "to talk to her to find out what the issue was." *Id.* at 120. Appellant admitted to waiting in the grass outside the VFW for Moran to exit stating he "wanted a straight answer." *Id.* at 121.

When Moran came into the parking lot, Appellant stated he started towards her but that she ran back towards the VFW door and that Blosser had tucked a gun into his waistband. *Id.* at 123. Appellant testified that Blosser cocked the gun but put it away when he told Blosser this was only between him and Moran. *Id.* at 123-124. Appellant said he followed Moran to the door and "tried to hug her" because she was upset. *Id.* at 124. Appellant then heard Blosser say "you better run. I'm going to put one in your ass." *Id.* As a result, Appellant said he "dropped" Blosser by hitting him and knocking him out. *Id.* at 124-125. Moran hit Appellant from behind causing him to fall and scrape his knee. *Id.* at 125. Appellant admits that he stepped on and smashed Blosser's cellphone and sunglasses. *Id.* at 125. Appellant testified that as Blosser "came to" he saw him looking at the gun so Appellant grabbed it by the barrel. *Id.* at 125-126. Appellant testified he grabbed the gun because he believed Blosser was going to shoot him. *Id.* at 126. Appellant denied ever pulling the trigger and said he left with the gun in his truck. *Id.* at127-128.

Appellant testified that he drove to Kevin O'Brien's home, his neighbor, and requested that he call 911, since his own cell phone battery was dead, to say Blosser pulled a gun on him and he took the gun. *Id.* at 127-128. Kevin O'Brien corroborated the same. *Id.* at 112-115. Appellant testified he waited for the police to stop his truck and complied by getting out with his hands up and informing them the gun was located on the front seat. *Id.* at 129. Appellant admitted that he is not permitted to possess a firearm. *Id.* The video surveillance was played for the jury again with the Appellant narrating his version of the events. *Id.* at 130-135.

## DISCUSSION

In his only issue raised on appeal, Appellant claims the evidence presented at trial was insufficient to find him guilty of six of the charges: theft by unlawful taking, receiving stolen property, possession of a firearm prohibited, firearms not to be carried without a license, terroristic threats and possession of a weapon. The Court disagrees. Appellant did not take an appeal from the guilty verdicts of simple assault, recklessly endangering, and disorderly conduct.

When a party challenges the sufficiency of the evidence, the critical inquiry on review does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. *Commonwealth v. McCurdy*, 943 A.2d 299, 301 (Pa.Super. 2008). Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. All of the evidence and any inferences drawn therefrom must be viewed in the light most favorable to the Commonwealth as the verdict winner. *Id.* at 301-302. While it is true that the Commonwealth must prove every essential element of a crime beyond a reasonable doubt, it is well established that the Commonwealth may sustain this burden by means of wholly circumstantial evidence. *Commonwealth v. Richardson*, 357 A.2d 671, 673 (Pa.Super. 1976). The Commonwealth need not preclude every possibility of innocence or

- 7 -

establish the Appellant's guilt to a mathematical certainty. *Commonwealth v. Williams*, 871 A.2d 254, 259 (Pa.Super. 2005).

Further, any doubts regarding an appellant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that no probability of fact may be drawn from the combined circumstances. The trier of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Commonwealth v. Robertson-Dewar*, 829 A.2d 1207, 1211 (Pa. Super. Ct. 2003).

With the above principles in mind, we now consider whether the Commonwealth presented sufficient evidence to sustain Appellant's convictions.

Section 3921 - Theft by unlawful taking or disposition provides that, "[a] person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." Section 3925. - Receiving stolen property provides that, "[a] person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner."

Here, the evidence presented to the jury by the Commonwealth is that Appellant took the Glock pistol belonging to Barry Blosser. Appellant testified admitting that he took the gun put provided the justification that he did so in self-defense to prevent Blosser from using the firearm on him. The jury, as fact finder, gave no credit to Appellant's testimony, and the evidence was more than sufficient for the convictions of these two charges.

Section 6105 - Persons not to possess firearms provides that a person who has been convicted of certain enumerated offenses "shall not possess [...] a firearm in this Commonwealth." Section 6106 - Firearms not to be carried without a license prohibits "any

person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter."

The Commonwealth and Appellant entered stipulations that he is in a class of persons not permitted to possess a firearm and that he did not have a valid license to carry a firearm. *Id.* at 101-103. The testimony presented, and believed by the jury, is that Appellant possessed the Glock pistol belonging to Barry Blosser and that he was in a class of persons not permitted to possess that firearm. Again, the jury did not excuse Appellant's behavior. Accordingly, these two issues are without merit.

Section 2706 - Terroristic threats provides that, "[a] person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to [...] commit any crime of violence with intent to terrorize another." Appellant was charged with communicating threats to commit a crime of violence by pointing a loaded Glock pistol and yelling that he would shoot Barry Blosser, Judith Moran, and Karen Ware, with the intent to terrorize them. Sufficient evidence existed to support this conviction in that Blosser, Moran, Leadbeater, and Ware testified they all saw Appellant with the Glock handgun waving the gun and threatening to shoot.

Section 907(b) - Possession of weapon prohibits possession of "a firearm or other weapon concealed upon his person with intent to employ it criminally." Appellant was charged with possession a hammer, concealed upon his person, with intent to employ it criminally. Trooper Moyemont testified that a hammer was found in the area near where Blosser demanded Appellant drop his weapon. Moran testified that the object was long, like a stick, but she could not positively identify it. Blosser testified the object looked like a crowbar. Circumstantial

evidence was sufficient that the instrument first possessed by Appellant was the hammer found at the scene of his crime.

Viewed under the aforementioned standard, and with this law to guide us, we find Appellant's challenge to the sufficiency of the evidence frivolous. A review of the record reveals evidence, sufficient in kind and quality, presented at trial, such that the trier of fact permissibly concluded that Appellant committed the offenses for which he was convicted when he lied in wait for Moran to exit the VFW then committed the terrors outlined *supra*.

Wherefore, it is respectfully submitted that the entire appeal is without merit and should be denied.

BY THE COURT:

_____ J.
NANCY D. VERNON, JUDGE

ATTEST:

_____
CLERK

FILED
2018 JAN 23 PM 3:22
JANICE SNYDER
FAYETTE COUNTY
CLERK OF COURTS

1-24-18  9:51
LIST/DATE

DEF_____
DA____|
PO  |
PD____|
WARD  ₤
SHER____
CA____|
ATTY____
CC____
Bar Assoc-1

- 10 -